# Beaver Valley Water Co., Appellant, *v.* The Public Service Commission.

*Public Service Commission—Water companies—Rates—Judicial determination of matter in controversy — Review by Superior Court.*

On appeal from an order of the Public Service Commission the Superior Court is the judicial tribunal to which, according to its own independent judgment, is committed under the Public Service Company Law, the duty of an adequate judicial hearing upon, and

review of, the action of the Public Service Commission on the question of confiscation.

On appeal from order of the Public Service Commission holding that a water company's rates are unreasonable the Superior Court will determine: first, whether the order of the commission is reasonable and in conformity with law, or confiscatory; and second, if it be confiscatory, whether the fair value of the water company's property for rate-making purposes is sufficient to justify the collection of the schedule rates, or if not, what revenue the company is entitled to receive based upon the fair or reasonable value for rate-making purposes of its property used for the convenience of the public. If under the second item for consideration it determines that the schedule of rates fixed by the company is not unreasonable and exorbitant, based upon the fair value of its property for rate-making purposes, it must reverse the order fixing a valuation insufficient to sustain such rates and dismiss the complaints. It is not required to go further and fix the exact fair value of the appellant's property for rate-making purposes, over and above a sum which will justify the return asked for by the company in its schedule.

On appeal from the decision of the Public Service Commission fixing the value of the property of the water company for rate-making purposes the Superior Court, after reviewing the testimony, found the value of the property to be in excess of $1,475,000, whereas the order of the commission had fixed a valuation of but $985,-000. In such circumstances the order of the Public Service Commission was confiscatory and in violation of the due process clause of the Federal Constitution and will be reversed.

Argued November 18, 1920. Appeal, No. 88, April T., 1917, by Beaver Valley Water Company, from order of the Public Service Commission of Pennsylvania, Complaints Nos. 187, 188, in case of Solon G. Thayer et al. v. Beaver Valley Water Company. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Reversed.

Complaint against Beaver Valley Water Company on account of increased rates effective April 1, 1914.

The charges in the suit were alleged to be unjust and unreasonable.

255, (1921).] Statement of Facts—Opinion of the Court.

The facts appear in Beaver Valley Water Company v. The Public Service Commission, 71 Pa. Superior Ct. 43, and in the opinion of the Superior Court.

Following the judgment of the Superior Court of the United States in case of Ben Avon Boro. et al. v. Ohio Valley Water Company, 253 U. S. 287, the Supreme Court of Pennsylvania remitted the record of this case to the Superior Court of Pennsylvania, with direction that the latter court should, upon its own independent judgment as to the law and facts involved, dispose of the questions therein raised. In accordance with the above order the Superior Court filed the following opinion dismissing the complaints before the Public Service Commission.

*Joseph A. Beck,* and with him *McKee, Alter* and *Mitchell,* for appellant.

*Lawrence M. Sebring,* for appellee.

*Berne H. Evans,* counsel for the Public Service Commission.

OPINION BY KELLER, J., March 5, 1921:

When this appeal was here before (71 Pa. Superior Ct. 43), we felt constrained to affirm the order of the Public Service Commission, because we were not permitted to substitute our judgment as to rates and values for that of the commission, (Ben Avon Boro. v. Ohio Valley Water Co., 260 Pa. 289), although it was apparent from our opinion that they did not concur. Following the action of the Supreme Court of the United States in the Ohio Valley Water Company case, (253 U. S. 287), our Supreme Court has remanded the case to this court with direction that upon our own independent judgment as to both the law and facts involved, we dispose of the question or questions raised. We understand from this action of our highest state court that they have determined

that this court is the judicial tribunal to which, according to its own independent judgment, is committed, under the Public Service Company Law, the duty of an adequate judicial hearing upon, and review of, the action of the commission on the question of confiscation, opportunity for which judicial review, it was held by the Supreme Court of the United States in the Ohio Valley Water Company case, was necessary to make the Public Service Company Law conform to the fourteenth amendment to the federal Constitution.

This matter arose out of complaints filed with the commission charging that the schedules of rates filed by the water company were unreasonable and exorbitant. Our duty in the premises is to determine: First, whether the order of the commission is reasonable and in conformity with law, or confiscatory; and second, if it be confiscatory, whether the fair value of the water company's property for rate-making purposes is sufficient to justify the collection of the scheduled rates, or if not, what revenue the company is entitled to receive based upon the fair or reasonable value for rate-making purposes of its property used for the convenience of the public. If under the second item for consideration, we determine that the schedule of rates fixed by the company is not unreasonable and exorbitant, based upon the fair value of its property for rate-making purposes, we must reverse the order and dismiss the complaints; we are not required to go further and fix the exact fair value of the appellant's property for rate-making purposes over and above a sum which will justify the return asked for by the company in its schedule.

The appellant on July 1, 1912, filed a schedule of rates about fifteen per cent higher than those previously in force and on February 18, 1914, adopted a new schedule, effective April 1, 1914, raising the rates fixed in the 1912 schedule so as to increase the gross revenue about twenty-five per cent. The rates under the 1912 schedule were calculated to provide a gross annual income of about

$136,000; while those under the 1914 schedule were calculated to produce a gross revenue of $175,000, or $166,-250, after allowing a discount of five per cent for prompt payment. Complaints were filed against both these schedules on April 20, 1914, after the later schedule had become effective. The commission after an extended hearing filed its report determining the fair value of the company's property for rate-making purposes to be $985,-000, and that the company was entitled to an annual return thereon of $135,950; and ordered it to file a schedule of rates in accordance therewith. In calculating the gross annual income which the company was entitled to, the commission allowed an annual return of seven per cent on the fair property value as above, $68,950; operating expenses, $53,000; taxes, $2,000; and annual depreciation, $12,000. Using the same rate of return, the same figures for taxes and operating expenses and the same percentage of depreciation, the fair value for rate-making purposes of appellant's property, used for public convenience, would have to be $1,463,500, in order to secure the gross revenue, exclusive of discounts, of $175,-000 which the 1914 schedule of rates was calculated to produce.

The Public Service Company Law (article V, section 20a), directs that in ascertaining and determining the fair value of a public service company's property it may [shall] take into consideration among other things (1) the original cost of construction; (2) the amount in market value of its bonds and stocks; (3) the probable earning capacity under the rates fixed by the commission; (4) expenditures for obsolete equipment and construction,—(as warranted, in connection with (2), (3) and (4), by the circumstances and historical development of the enterprise)—; (5) reproduction costs of the property, based upon the fair average price of materials, property and labor; (6) developmental and going concern value—all of which, together with any other ele-

ments of value, are to be given such weight as may be just and right in each case.

On the question of original cost of construction, a public accountant called by appellant presented a detailed calculation taken from its books and those of its underlying companies showing a plant expenditure of $1,584,580.88, not including interest, taxes, cost of supervision during construction, financing, and going concern cost, but the commission held, and properly so, we think, that this was not an accurate determination of its actual cost in money. Appellant was organized in 1902 and by lease, contract or purchase took over and operates ten water companies, located in nine closely neighboring municipal districts along the Ohio and Beaver rivers.

These companies, organized between 1879 and 1902, did not have modern methods of bookkeeping, and were not as careful in separating on their books their various items of expenditure as public service companies are now required to be, and besides, in some instances, in the purchase of property and in construction contracts, they paid the consideration money in bonds and/or stock, the actual value of which at the time is not now ascertainable.

With respect to the bonds and stock of the company, it was shown that capital stock of appellant to the amount of $1,000,000, and bonds of appellant and its underlying companies to the amount of $1,063,000, are issued and outstanding, besides floating indebtedness of $184,000, secured by bonds of the underlying companies; but there was no evidence as to their market value.

The commission therefore determined that the present value of appellant's property would most nearly approximate its reproduction cost new less depreciation. This it found to be $983,161.05. It accordingly valued appellant's property for rate making purposes at $985,-000, as of February 1, 1915.

In determining the reproduction cost new, the engineers representing appellant, complainants and the

commission, respectively, agreed upon a number of items entering into such cost, both as respects their usefulness and their cost of reproduction as follows:

| | |
|---|---:|
| Trunk line and distributing system, | $430,105.98 |
| Reservoirs and tanks, | 56,750.00 |
| Power and filtration plants, | 314,300.00 |
| General properties, | 13,492.00 |
| Meters owned by appellant, | 2,200.00 |
| Total items agreed upon, | $816,847.98 |

The commission also allowed in full certain other items, the reproduction cost of which had been agreed upon by the engineers, to wit: Pipe in Rochester Township, $25,300; pipe in New Brighton, $10,258.78; Bentley pumping plant, $50,000, totalling $85,558.78, as to which items we concur with the commission.

The engineers also agreed upon the reproduction cost of certain other items, but disagreed as to their being proper items for consideration in the present value of the property. They are as follows:

(1) Cost of twelve-inch pipe line from the Borough of Freedom to Conway,—agreed reproduction cost, $15,772. The commission allowed the cost of so much of the pipe as was used in the Borough of Freedom, $3,440, and disallowed the remainder. We uphold the action of the commission in this respect for the reasons set forth in the opinion of Judge KEPHART when the case was here before. It was stated at the argument, however, that the Pennsylvania Company contemplated giving up its present water supply system in Conway and securing water from the appellant company through this main. If this should be the case the appellant would be entitled to the value of the entire pipe line from Freedom to Conway on any subsequent valuation.

(2) Duplicate pipe lines, etc., in Beaver Falls, $40,336.40. These duplicate lines form part of the distribution system of the Peoples Water Company taken over

by appellant company. There is no question that they are used by the company and, in our judgment, they are useful. Our views on this item were fully expressed by Judge KEPHART in our former opinion and we adhere to them. It does not matter that the pipes might not be relaid in the same form if an entirely new distribution system were being planned. Neither of the present pipe lines supplies all the appellant's customers, and it would be an unnecessary waste of money to take out the one line and connect the customers on it with the other line. The reproduction cost agreed upon, $40,336.40, should have been allowed.

(3) Peoples Warehouse—Agreed reproduction cost, $5,000. This was the old pump house of the Peoples Water Company, and is now used as a storehouse by the respondent. That it is not used for the purpose for which it was built does not take away from the fact that it is both used and useful and should have been allowed for the agreed value, $5,000.

(4) New Brighton Reservoir—reproduction cost new, $3,000. This item was disallowed by the commission and, in our judgment, rightly so. It is not used and has not been used for many years and at the time this complaint was filed it had trees in it of eight and ten years' growth.

(5) Upper Freedom Reservoir—reproduction cost new $4,000. This reservoir has not been used for twelve or fourteen years. Its place has been supplied by the lower and larger reservoir. We agree with the commission that it was rightly excluded.

(6) Freedom Pumping Station—reproduction cost new, $13,500. This plant was used originally to pump unfiltered water from the Ohio river. It has been shut down since 1907. The only use suggested for it would be for fire protection in case the other pumping stations should be out of commission. This would require the simultaneous breaking down of the Eastvale, New Brighton and Bentley pumping plants, and would result

in the pumping of unfiltered Ohio river water into the mains containing filtered water. We think the commission committed no error in excluding it from the valuation, especially so as the plant is not kept in order and would require at least several days to fit it for use in such an emergency. It is disallowed as an item of valuation.

In addition to the foregoing, there were a number of items upon which the engineers for the respective parties could not agree as to the reproduction cost, or in some instances as to both such costs and the usefulness of the item claimed. They are as follows:

(7) Eastvale dam, exclusive of west abutment. On this item there was a wide variance between the figures of the several engineers. Those of the appellant calculated that the reproduction cost was in the neighborhood of $122,000; while the average of the complainants' engineers was $41,785. The difference was largely as to the method of construction and the protection required during construction. The commission allowed a reproduction value of $67,500. We have gone carefully over the testimony relative to this item and, in our judgment, the manifest weight of the evidence is with the appellant, and the reproduction cost new of the Eastvale dam, exclusive of the west abutment, is at least the lowest figure fixed by the appellant's engineers, $108,120.

(8) West abutment of Eastvale dam. The testimony as to the reproduction cost of this abutment was $27,180. The commission disallowed it because it was built at the cost of the Pittsburgh and Lake Erie Railroad Company. We have carefully considered this item and, in our judgment, it forms part of the appellant's dam. The fact that by agreement between the respective parties it was built by the railroad company and is also used by them for railroad purposes does not take away the right of the appellant to have it valued as part of its plant. It matters not who paid for it if it forms part of appellant's plant and is used in connection with the public service.

It is no part of our duty to measure the value of the consideration given by appellant under said agreement. If the railroad company had built the entire dam in return for such consideration, the appellant would have been entitled to have had its value included in the valuation of its property for rate-making purposes. The west abutment is allowed at $27,180.

(9) New Brighton dam. In our judgment, the manifest weight of the evidence was with the appellant on this item and it should have been allowed at $29,842.78, instead of $16,300 as allowed by the commission.

(10) Replacing street pavements over pipe lines and hydrant leads. The commission allowed $5,183.68, representing the cost of repaving over lines where the respondent had been required to repave, but refused to allow $31,574.50, the estimated cost of repaving over lines which were laid before the streets were paved.

It is true that if these lines were to be laid to-day the pavements would have to be taken up and streets repaved at a cost approximating $31,574.50, but as no part of such cost was incurred or paid by the company, and the pavements do not belong to it, the item would have to be rejected in fixing the present value of appellant's property for rate-making purposes, for the company admittedly made no such expenditure on its physical plant and should not be entitled to a fictitious credit therefor. We uphold the action of the commission in disallowing the claim for paving where the mains were laid before the pavements: Des Moines Gas Co. v. Des Moines, 238 U. S. 153, p. 172; People ex rel. Kings County Lighting Co. v. Willcox, 210 N. Y. 479, p. 494.

(11) Service lines installed by consumers. Appellant claims the sum of $60,861.50, as representing the reproduction cost new of these lines. What we have said with reference to the tenth item also applies here. If these lines were to be reproduced at this time the company would be required to pay for the installation of the service lines at the cost claimed by appellant, but when

these lines were laid the cost of installing the service lines was paid by the consumers, and the company's title to them has not been established in this record; and therefore were this cost included in the reproduction cost new a corresponding deduction would have to be made in determining the present value of the appellant's property for rate-making purposes. It admittedly expended none of this money and is not entitled to a fictitious credit therefor. The value of the connections as a part of the established business of the company (National Water Works v. Kansas City, 62 Fed. 853, p. 865), will be included under Going Concern Value. The item is disallowed.

(12) Valuation of real estate. The commission valued appellant's land, exclusive of structures, at $44,955. Appellant's objections to these figures are, that the valuation of the site of the New Brighton pumping station, $15,000, is too low; the valuation of the Eastvale pumping station on the east side, $11,250 is too low, and the commission has wholly excluded from its valuation the sites of the Freedom pumping station, Upper Freedom reservoir and New Brighton reservoir, and the land on the west side of the Eastvale pumping station. Here again the valuations given by the experts for the appellant and the complainants differ widely. Appellant's experts fix a valuation of one dollar per square foot for the land at the New Brighton pumping station, and on both sides of the Eastvale pumping station, and according to their testimony the total value of appellant's land, exclusive of structures, is about $302,000. On the other hand, complainants' witnesses fix a valuation but little above that of farm land. We are not able to accept the figures placed on this land by appellant's expert witnesses any more than we are those of the complainants' witnesses. In our judgment the valuation fixed by the commission for the site of the New Brighton pumping station is fair and reasonable under all the circumstances, but we think approximately the same valuation

should have been applied to the land on the east and west sides of the Eastvale dam. This would make the east side $37,500 and the west side $12,500, an increase over the figures of the commission of $38,750, or a total of $83,705. As we have ruled that the Freedom pumping station, Upper Freedom reservoir and New Brighton reservoir are neither used nor useful, we have not allowed any value in connection with their respective sites. The site of the Peoples Warehouse should be allowed, but a careful review of all the evidence has failed to show any testimony as to the value of this particular piece of land.

(13) Overhead during construction. We are of the opinion that the percentages allowed by the commission, to wit: ten per cent on the reproduction cost new of the physical property and seven per cent on the present value of the land is fair and reasonable in the circumstances and under all the evidence.

(14) Interest during construction. In our judgment, according to the manifest weight of the evidence it would take two years to reconstruct the plant and full interest allowance should have been made on the necessary expenditure during half the construction period, or five per cent instead of three and one-half per cent, as allowed by the commission. It will be calculated on the reproduction cost new of the physical property including overheads.

(15) Costs preliminary to construction, promotion service, franchise costs, financing costs and brokers' fees. On these items the appellant claims $30,000 for preliminary expenses and $120,000 for franchise, promotion and financing or brokers' costs.

The commission disallowed the items because the proof as to the sums actually spent for these items was inadequate and unconvincing. The commission overlooked the fact that, in determining the reproduction cost new of the plant, the original cost or historical cost does not control. The reproduction method is an en-

deavor to find out what it fairly and reasonably ought to have cost to establish the plant and business; what it fairly and reasonably would cost with proper management to establish it supposing the plant were to be reproduced. On this item the complainants produced no testimony except to point out that there was not sufficient proof that the sums claimed for these items had actually been spent. In our judgment, allowance should have been made for these expenses in figuring the reproduction cost. Under the evidence we feel satisfied that a fair valuation of these items, which are practically unavoidable costs in a plant of this character and size, (in spite of their not being definitely shown by the imperfect methods of bookkeeping originally employed), is at least $100,000.

(16) Water power at New Brighton and Eastvale dams. We are not specially impressed with the expert testimony as to the value of these water powers. Despite the evidence of the witnesses we are not convinced that the right to dam the water at the Eastvale dam over and above the cost of any structures or machinery in connection therewith is worth $258,800, or that a similar right at New Brighton is worth substantially the same amount. In this valuation we have nothing to do with the value of any water power that is not used in connection with the business of supplying water to the public. That the appellant might utilize water power now going to waste for manufacturing purposes furnishes no reason why water consumers should pay rates based on the valuation of such water power. On the other hand, in so far as the water power is used for the pumping of water in connection with the operations of the water company, and thereby saves fuel which would otherwise be expended in such pumping, appellant is entitled to the consideration of its value for such purpose. It is reasonably well settled in engineering circles that, unless there is a practically constant or unlimited supply of water, the economic use of water power must always

be in connection with an auxiliary steam plant. The failure of the old water power plants in the past has been largely due to a want of recognition of this principle. To the extent, therefore, that there is an actual saving to the company by the use of such water power, considering in connection therewith, however, the cost of the dam and the structure needed to produce such power and the interest on such investment, the company is entitled to a valuation of the water power so used. We are not satisfied that it approximates anything near the $169,-000 claimed by appellant company and we do not now fix any definite value upon it, but we have given it consideration in fixing the present value of appellant's property for rate-making purposes.

(17) Bed of Beaver river. The commission refused to allow any value to this item. From the evidence, the appellant seems to have title in fee simple to the bed of the Beaver river to high watermark from the Eastvale dam to the mouth of the Conoquenessing river. The evidence shows conclusively that it has great value as a sedimentation pool. In our judgment, the value of this pool in connection with the purposes for which it is being used has been shown to be at least $25,000. The bed of the river was not granted by the Commonwealth to the appellant or any of its constituent companies for the purpose of furnishing water to the public. It was granted to another company for an entirely different purpose. The appellant is the owner by purchase at sheriff's sale of the rights in the bed of the river belonging to the former owner. In our judgment it is entitled to have a reasonable valuation placed upon it for rate-making purposes and we allow it as above.

(18) Working capital. A large portion of the appellant's revenues are paid quarterly, at the end of each quarter. We do not think, under the circumstances, the sum of $25,000 for working capital, accounts receivable, and supplies on hand as asked for by appellant is extravagant or unreasonable. The commission stated that

materials and supplies on hand were valued by the engineers as a part of the plant equipment. As the amount thus included is not set forth in the record before us, we have concluded not to disturb the additional amount in cash allowed by the commission under this item, $5,000.

(19) Going concern cost. The commission frankly allowed appellant company nothing on account of this item in determining reproduction cost new or the present value of appellant's property for rate-making purposes. We are of opinion that this was a proper item to be considered in such valuation. The going concern value represents the difference in value between the bare physical plant of the company ready to do business and an equal plant with an income established from customers who are not under compulsion to utilize the service of the company, the business of which has been acquired gradually, and if reproduced would again be acquired gradually with an inevitable lag in getting customers. It is difficult to determine and cannot be ascertained with absolutely exact accuracy, but that is no reason why a fair allowance should not be made therefor: People ex rel. Kings County Lighting Co. v. Willcox, supra. "That there is an element of value in an assembled and established plant, doing business and earning money over one not thus advanced, is self evident. This element of value is a property right, and should be considered in determining the value of the property upon which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use": Des Moines Gas Co. v. Des Moines, 238 U. S. 153, p. 165. "That there is a difference between even the cost of duplication, less depreciation, of the elements making up the water company plant and the commercial value of the business as a going concern, is evident": Omaha v. Omaha Water Co., 218 U. S. 180. It does not depend entirely on the deficits of operation for if so, a company that never acquired sufficient customers to be a paying concern and was therefore financially a failure would have the great-

est going concern value. "The greater the loss, the greater would be the value of the plant": Hanover Boro. v. Hanover Sewer Co., 251 Pa. 95, p. 100. Such deficits, in so far as they are temporary and due to the lag in getting customers, are to be considered in connection with other matters; the profits earned from operation and paid as dividends, or put back into the plant; the character of the management; the growth of the earnings of the plant from year to year; the increased public benefits derived from the consolidations effected in return for the expenses in connection therewith; the length of time that necessarily ensued before the operation became financially successful, and any special circumstances in the particular case: Denver v. Denver Union Water Co., 246 U. S. 178, p. 192. In our opinion, under the circumstances of this case and the evidence presented, the going concern value of appellant company's present plant is at least $175,000. We obtain practically the same result in this connection whether we use the method of computing the going concern value testified to by Mr. Fuller, the consulting engineer, of estimating the reproduction cost of establishing the business of the water company, sometimes called the "comparative plant" method, or the "accrued-deficit" method, sometimes known as the Wisconsin commission method, as testified to by Mr. Blossom, another engineer, (see exhibit 25) based on the computation by the accountant, Mr. Main, (exhibit No. 41) of the amounts invested in permanent improvements or original cost of the plant; provided these figures are reduced by the payments made in stock but calculated by him as if made in cash at par value.

(20) We agree with the commission that no allowance should be made for estimated additions which are not actually anticipated. Actual improvements to February 1, 1915, $11,050.15, are allowed as in the report of the commission. We do not think that the accrued

depreciation of nineteen per cent, as fixed by the commission, is excessive or unreasonable.

Based on the foregoing and according to the plan worked out by the commission, we obtain the following result as to the reproduction cost new, less depreciation:

| | | |
|---|---:|---|
| Amount agreed upon by engineers,........$ | 816,847.98 | |
| Add items allowed by commission in full,.. | 85,558.78 | |
| Add item (1)—Pipe in Freedom,......... | 3,440.00 | |
| "    "    (2)—Duplicate pipes in Beaver Falls, .............. | 40,336.40 | |
| "    "    (3)—Peoples Warehouse, ...... | 5,000.00 | |
| "    "    (7)—Eastvale dam, ........... | 108,120.00 | |
| "    "    (8)—West abutment of Eastvale dam, ................ | 27,180.00 | |
| "    "    (9)—New Brighton dam, ...... | 29,842.78 | |
| "    "  (10)—Replacing pavements, .... | 5,183.68 | |
| | $1,121,509.62 | |
| "    "  (13)—Overhead during construction, 10%, ........... | 112,150.96 | |
| | $1,233,660.58 | |
| "    "  (12)—Land, .................. | 83,705.00 | |
| "    "  (13)—Overhead on land, 7%,.... | 5,859.35 | |
| | $1,323,224.93 | |
| "    "  (14)—Interest during construction, 5%, ............. | 66,161.25 | |
| "    "  (15)—Preliminary, promotion, brokers' costs, etc.,..... | 100,000.00 | |
| "    "  (17)—Bed of Beaver River,...... | 25,000.00 | |
| "    "  (18)—Working capital, ........ | 5,000.00 | |
| | $1,519,386.18 | |
| Less accrued depreciation on depreciable property—19% on $1,233,660.58, ...... | 234,395.51 | |

Reproduction cost new less depreciation
exclusive of going concern value, ......$1,284,990.67

Add item (19)—Going concern value,.... 175,000.00

Reproduction cost plus going concern
value, .............................$1,459,990.67

Add item (20)—Improvements to February 1, 1915, ...................... 11,050.15

Total as of February 1, 1915, ............$1,471,040.82

Taking into consideration and giving due weight, so far as is shown by the evidence, to all the matters required by the Public Service Company Law to be considered in fixing the valuation of the water company's property used for the convenience of the public including the value of the water power used and useful in the supply of water to the public, we have determined that the fair value for rate-making purposes of the respondent's property considered as a going concern, on February 1, 1915, was in excess of $1,475,000.

It follows that as the order of the commission would require the appellant to render its service to the public at rates based on a value of only $985,000, when for rate-making purposes its property devoted to the public use is valued at over $1,475,000, it is confiscatory and in violation of the due process clause of the federal Constitution.

The only other prayers contained in the complaints filed were that the minimum charge for water to be paid by meter customers and the service charge as specified in the schedule of 1914 should be declared unjust, unreasonable and discriminatory. The commission did not so find, neither do we. In fact, complainants' own witnesses testified to the reasonableness of the minimum charge and service charge respectively.

It appeared from the testimony that certain boroughs were using large quantities of water free of charge for flushing sewers and similar municipal purposes. Such

a practice discriminates against private consumers and other municipalities not enjoying such privileges (Vernon Twp. v. Public Service Commission, 75 Pa. Superior Ct. 54; Ohio Valley Water Co. v. Public Service Commission, 75 Pa. Superior Ct. 290), and should be discontinued. Any lessening in the cost of operation or increase in revenue resulting therefrom should be for the benefit of the public generally and should be reflected in any subsequent schedule of rates.

Having determined that the order of the commission is confiscatory and that the annual return to the appellant from the schedule of rates adopted in 1914 is not unreasonable in view of the value for rate-making purposes of the appellant's property devoted to the public convenience, we are required to reverse the order of the commission and remand the record with directions to dismiss the complaints, and it is accordingly so ordered. Costs to be paid by intervening appellees.